FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 1

STATE OF MICHIGAN

IN THE 46th JUDICIAL DISTRICT COURT

SOUTHFIELD NEIGHBORHOOD
REVITALIZATION INITIATIVE, LLC,

                    Plaintiff,

     vs.                              Case No. LT 17 4622

                                      Hon. Shelia R. Johnson

STEFANIE BOYD, and all other
occupants,

                    Defendants.
                                    _/

          The Deposition of FREDERICK E. ZORN, JR., C.E.C.D.,

          Taken at 26000 Evergreen Road,

          Southfield, Michigan,

          Commencing at 11:09 a.m.,

          Tuesday, February 6, 2018,

          Before Alan Stalburg, CER-9106.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ORIGINAL



U.S. LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    APPEARANCES:

2

3    JOSEPH G. COUVREUR

4    Pentiuk, Couvreur & Kobiljak, P.C.

5    2915 Biddle Avenue

6    Suite 200

7    Wyandotte, Michigan  48192

8    734.281.7100

9    jcouvreur@pck-law.com

10       Appearing on behalf of the Plaintiff.

11

12   SCOTT F. SMITH

13   Smith Law Group, P.L.L.C.

14   30833 Northwestern Highway

15   Suite 200

16   Farmington Hills, Michigan  48334

17   248.626.1962

18   smith3352@aol.com

19       Appearing on behalf of the Defendants.

20

21

22

23

24

25

TABLE OF CONTENTS

| WITNESS | PAGE |
| --- | --- |
| FREDERICK E. ZORN, JR., C.E.C.D. | |
| EXAMINATION | |
| BY MR. SMITH: | 4 |

EXHIBITS

| EXHIBIT | PAGE |
| --- | --- |
| (Exhibits retained by counsel.) | |
| DEPOSITION EXHIBIT 1 | 18 |
| DEPOSITION EXHIBIT 2 | 22 |
| DEPOSITION EXHIBIT 3 | 22 |
| DEPOSITION EXHIBIT 4 | 22 |
| DEPOSITION EXHIBIT 5 | 22 |
| DEPOSITION EXHIBIT 6 | 27 |
| DEPOSITION EXHIBIT 7 | 27 |
| DEPOSITION EXHIBIT 8 | 27 |

FREDERICK E. ZORN, JR., C.E.C.D.,
February 6, 2018

Page 4



1    Southfield, Michigan

2    Tuesday, February 6, 2018

3    11:09 a.m.

4

5                FREDERICK E. ZORN, JR., C.E.C.D.,

6    was thereupon called as a witness herein, and after

7    having first been duly sworn to testify to the truth,

8    the whole truth and nothing but the truth, was

9    examined and testified as follows:

10                             EXAMINATION

11   BY MR. SMITH:

12   Q.   Okay.  Mr. Zorn, I'm Scott Smith.  I represent the

13        Defendant, Stefanie Boyd, and occupants in this

14        matter.  You've been deposed before?

15   A.   Yes, sir, I have.

16   Q.   So I'm not going to go through the rules and you have

17        counsel here so if anything comes up we can go from

18        there.  Let's start with some background information.

19             Please state your full name for the record.

20   A.   It's Frederick E. Zorn, Jr.

21   Q.   Okay.  And tell me a little bit about your -- let's

22        start with your educational background?

23   A.   Undergraduate degree from Oakland University,

24        political science, public administration.  Graduate

25        studies, Wayne State.  I have certifications in

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 5



1   housing and economic development from National
2   Development Council, as well as a certified economic
3   developer. I have been with the City of Southfield
4   now since October of 2008. What is that, nine years?
5   Q.   Okay. So you got a master's degree, you've gone --
6   A.   I have graduate studies in urban planning. I have not
7        completed my urban planning degree.
8   Q.   So what you mean is you've gone to graduate school but
9        you haven't gotten your Ph.D., is that what you're --
10  A.   I have not finished my master's degree, sir.
11  Q.   Oh, okay, I get it. Okay. And so what was your --
12       well, you can do this as a narrative unless your
13       attorney objects, just to expedite it. Go through
14       your job history.
15  A.   Job history? I worked for a regional economic
16       development called the Downriver Community Conference,
17       did small business counseling, was a certified small
18       business development counselor by the U.S. Small --
19  Q.   Give us some dates so I can --
20  A.   1986 --
21  Q.   Okay.
22  A.   -- to -- I was there until 1990, '91.
23            Then I, prior to that, formed a group
24       called ROI, which was a nonprofit consulting
25       development corporation. We did that for about three

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    years and then I went to work for the City of

2    Melvindale. I was there from 1994 to '97. I was with

3    the City of Taylor from 1997 to 2008, and 2008 till

4    present here in Southfield.

5    Q.   Okay. And what was your first job at Southfield?

6    A.   Deputy city administrator.

7    Q.   And who hired you?

8    A.   James Scharret, the city administrator, and as

9         approved by city council.

10   Q.   So explain to me, like who's -- so right now what's

11        your title?

12   A.   I am the city administrator.

13   Q.   And you have the same title as you did 10 years ago?

14   A.   No. When I came here I came in as deputy city

15        administrator.

16   Q.   Okay. So you've been promoted?

17   A.   Yes.

18   Q.   And who's your boss?

19   A.   City council.

20   Q.   The city council?

21   A.   Yes.

22   Q.   And so is there one particular person on the city

23        council that you report to?

24   A.   We have -- city council has a city council president

25        and a pro tem, but my day-to-day response -- reporting



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 7

1    you could say is just to council president.

2    Q.   And educate me, is the city council a full-time job or

3         a part-time job?

4    A.   City council here in Southfield is a part-time job.

5    Q.   And so how many hours a week do they have to work, or

6         is there any rules?

7    A.   There aren't any rules.  I can tell you they put in

8         more than a typical part-time job if you define a

9         part-time job as 20 hours.  They put in more than 20

10        hours a week.

11   Q.   Okay.  And so the mayor, is that a part-time job?

12   A.   Yes, it is.

13   Q.   And how many -- do you have interactions with the

14        mayor?

15   A.   Yes, I do have interactions with the mayor.

16   Q.   Would -- on a daily basis?

17   A.   I have -- I would say probably every other day and I

18        do a weekly with the mayor and the council president.

19   Q.   Do you -- how do you communicate with the mayor?

20   A.   Usually we do a weekly verbal discussion, go through a

21        list of things.

22   Q.   In person or is it by phone?

23   A.   In person with the council president and the mayor, we

24        do it weekly.

25   Q.   So --



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 8



1                MR. COUVREUR:  I guess I just want to maybe

2    at least put in an irrelevance.  This is a

3    landlord/tenant case and I don't know where we're

4    going with all this, but --

5                MR. SMITH:  I'm just trying to understand

6    what he does.  I haven't gotten -- I'm almost done

7    with this part.

8                MR. COUVREUR:  Okay.

9    BY MR. SMITH:

10   Q.   All right.  So you're the deputy city administrator?

11   A.   No, I'm the city administrator.

12   Q.   You're the city administrator.  All right, thank you.

13   And on a day-to-day, I understand you report to city

14   council, is there anyone with more authority in this

15   building than you when the elected officials aren't

16   here?

17   A.   It depends upon the jurisdiction and the item being

18   discussed.

19   Q.   Okay.  So tell me what you think your responsibilities

20   are and authority is on a day-to-day basis?

21   A.   The police and fire department report to me.  Parks

22   and rec department reports to me, the finance

23   department, information technology department.

24   Various departments report to me.  Let me tell you who

25   has a direct report to city council.  Other direct

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 9



1    reports to city council are the city attorney, the

2    city planner.  The city assessor has a direct report

3    to the mayor in Southfield by charter.  It's a very

4    unique structure, it's not your standard international

5    city manager's model but that's the model that was put

6    together.

7    Q.    Is the city attorney a full-time job in Southfield?

8    A.    Yes, it is.

9    Q.    And who's the present city attorney?

10   A.    The present city attorney?

11   Q.    Yeah.

12   A.    Susan Ward.

13   Q.    Okay.  And then is she married to Gerald Witkowski?

14             MR. COUVREUR:  Wait a minute here.  Again,

15   I guess I'm going to object to this is a

16   landlord/tenant action.  This is like a -- not a --

17   what does this have to do with the case?

18             MR. SMITH:  Your objection is so noted.

19             MR. COUVREUR:  Okay.

20   A.    The question?

21   BY MR. SMITH:

22   Q.    I believe it was is Jerry Witkowski married to the

23   city attorney?

24   A.    I believe they are.

25   Q.    Okay.  Now, besides being a deputy -- oh, another

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 10

1              question.

2                        You have a -- who handles city ordinance

3       violations for housing?

4       A.       For --

5       Q.       Is that the building and zoning department?

6       A.       Give me -- I need a more specific question.

7       Q.       Well, if -- you have city ordinances that pertain to

8       housing and real property in the city, correct?

9       A.       We have zoning ord -- yes, we do, but we have certain

10      staff members who have certain constable powers,

11      therefore if there's a specific question I need to

12      know -- if you're going to ask me who has what

13      power --

14      Q.       Well, I'm trying to figure out what the structure of

15      the various departments.

16      A.       We have --

17      Q.       Let's say you don't mow your grass.  Who would be in

18      charge of that specifically?

19      A.       An excellent example.  Code enforcement would be

20      responsible if you don't mow your grass.

21      Q.       So you have a separate code enforcement --

22      A.       We have a code enforcement --

23      Q.       And who's in charge of that department?

24      A.       Maria Calhoun.

25      Q.       Maria Calhoun?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 11

1   A.   Yes.

2   Q.   Okay.   And is she a paid Southfield official?

3   A.   She's an employee, yes.

4   Q.   Okay.   And what about zoning issues?

5   A.   Zoning issues?   Again, it would come down to a

6        particular type of question.   We do have a planning

7        director and a planning division, and then --

8   Q.   Is that a full-time position?

9   A.   Yes.

10  Q.   What's his name?

11  A.   My planning director -- and we have a large staff.  My

12       planning director is Terry Croad.

13  Q.   Croad, did you say?

14  A.   Yes, Croad.

15  Q.   Spell it for me?

16  A.   C-r-o-a-d.

17  Q.   Okay.   Now, do you have a building department?

18  A.   Yes, sir, we do.

19  Q.   And what do they handle, permits and stuff like that?

20  A.   Permits and, you know, their enabling powers in

21       essence are consistent with State statute, but they

22       issue building permits, review building plans.

23  Q.   Are you involved with the code enforcement department?

24  A.   The code department reports to me.

25  Q.   What about the building department?





1    A.    The building department reports to myself, as well.

2    Q.    What about the planning department?

3    A.    The planning department is a direct report to city

4          council.

5    Q.    Does Southfield have a master plan?

6    A.    Yes, we do.

7    Q.    And how long has it had a master plan?

8    A.    Since I've been here a master plan was adopted in

9          February of '09 and we've recently did one in the last

10         year and a half. I'm not sure of the exact but since

11         I've been here the State enabling act requires that

12         the master plan be reviewed and updated every five

13         years, and we're in compliance with that act.

14   Q.    So when was the last time it was reviewed?

15   A.    I would need to have the document in front of me. I

16         just don't know the exact date.

17   Q.    How would one get a copy of the master plan; is --

18   A.    You can --

19   Q.    -- it public record?

20   A.    -- go online.

21   Q.    What?

22   A.    You can go online. It's under departments, planning.

23         It's right there.

24   Q.    And that's the up-to-date one?

25   A.    The up-to-date one is online, as well, yes.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 13

1   Q.   Do you know if the master plan deals with blight?

2   A.   With what?

3   Q.   Does the master plan deal with blight?

4   A.   With blight?  I don't know.

5   Q.   But you would be in charge of -- well, tell me who's

6        in charge of developing the master plan?

7   A.   The city planner is.

8   Q.   And you -- and do you have any involvement with them?

9   A.   Yes, I do.

10  Q.   And what's your involvement?

11  A.   As we go through the planning process I sit in the

12       meetings, review it.  You're asking me if there's a

13       specific reference to blight at this time.  I don't

14       know if there's a specific reference to blight within

15       the master plan.

16  Q.   Did you ever know?

17  A.   I would know if I looked at it.

18  Q.   When was the last time you looked at it?

19  A.   Gosh, I reviewed a chapter of it over the weekend.

20       There's multiple chapters in the planning document.  I

21       looked at the section on roads.

22  Q.   Is it all online?

23  A.   It's all online, each chapter.

24  Q.   How many chapters are there?

25  A.   I don't know exactly how many.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 14

1    Q.    Okay.  So just -- all right.  So you have a master

2          plan, you're involved with it.  I assume the mayor's

3          involved with it?

4    A.    The mayor, city council, the planning commission.

5                MR. COUVREUR:    You know what, I guess I'm

6          just going to -- I'm not sure what this has to do with

7          a landlord/tenant action.  It seems like you're on a

8          fishing expedition for the other case.

9                MR. SMITH:    Well, I'm trying to figure out

10         what about this house here and who's in charge of

11         making these decisions.

12               MR. COUVREUR:    Decisions regarding what --

13               MR. SMITH:    It says --

14               MR. COUVREUR:    -- who owns it?

15               MR. SMITH:    I already so noted but if

16         you -- you know, I would say that -- I mean, you know

17         the Court Rules.  You could tell him not to answer and

18         then we can take it up with the judge.

19               MR. COUVREUR:    Well, I'm not going to tell

20         him not to answer but I'm just --

21               MR. SMITH:    Yeah.

22               MR. COUVREUR:    I'm just trying to figure

23         out, you know, is this just a fishing expedition or

24         are you -- how does this pertain to this

25         landlord/tenant case is my objection with respect to



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1

2          this?

3              MR. SMITH:  Well, because -- it pertains

4      because I'm trying to find out how these houses became

5      owned by the NRI.

6              MR. COUVREUR:  Ask him that question.

7              MR. SMITH:  I'm going to very, very soon.

8              MR. COUVREUR:  Okay.  He'll tell you.  I

9      assume he'll tell you if he knows.

10             MR. SMITH:  That's the way -- that's

11     exactly where we're going but I just want to make sure

12     I understand the whole what's going on here.

13  BY MR. SMITH:

14     Q.   How many people work for you, directly report to you?

15     A.   There's a little over 500 employees.  I don't know the

16          exact count how many report to me.

17     Q.   So you're like almost -- on a day-to-day basis you're

18          like -- almost like the -- you're like the highest

19          ranking guy here; is that -- would it be fair to say?

20     A.   I have rank in certain areas but I don't -- my

21          planning director outranks me, my city attorney

22          outranks me in their areas.  My purchasing agent, who

23          reports to me, has certain powers granted to her -- or

24          to that position by charter.

25     Q.   But in the areas you listed you're the -- like the

            decision --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 16

1  A.  I'm the city manager.  I make recommendations to city
2      council.
3  Q.  Do you have a written job description?
4  A.  Yes, I do.
5  Q.  Where would one find that?
6  A.  A little bit of digging, you could probably find it on
7      the City's website, but my personnel department has
8      job descriptions.
9  Q.  Did you personally hire the law firm who's
10     representing the NRI?
11 A.  Did I personally --
12 Q.  Yeah.
13 A.  -- hire the -- no.
14 Q.  Who did?
15 A.  The NRI, who hired -- I don't understand the question.
16     Who hired -- what is the question.
17 Q.  Who hired legal counsel?
18 A.  Which legal counsel?
19 Q.  Joe Couvreur's firm.
20 A.  Pentiuk, Couvreur & Kobiljak?
21 Q.  Yeah.
22 A.  They were hired by the Southfield Nonprofit Housing
23     Corporation.
24 Q.  Okay.  So maybe we'll get to that.  All right.  So did
25     you see the notice of taking deposition in this case,


US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    duces tecum?

2  A.  The what?

3  Q.  Have you ever reviewed the notice of taking deposition

4    duces tecum in this case?

5  A.  The four-page --

6  Q.  Yeah.

7  A.  I've reviewed it.

8  Q.  I see you have some legal papers in front of you?

9  A.  Yeah.  This question here?

10        MR. COUVREUR:  No, no.  This is what he's

11    talking about.

12        MR. SMITH:  Is that your work product?

13        THE WITNESS:  This is --

14        MR. COUVREUR:  No, this is -- this is what

15    he's talking about.

16        MR. SMITH:  Well, here, let's mark --

17        MR. COUVREUR:  Right here.  Show him

18    what --

19        MR. SMITH:  We'll mark --

20        THE WITNESS:  Oh, I reviewed --

21        MR. SMITH:  We'll mark it as an exhibit.

22        THE WITNESS:  I reviewed this and --

23  BY MR. SMITH:

24  Q.  Wait, just let him mark the document.  What are all

25    those papers?  Are you at liberty to tell me?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



US LEGAL SUPPORT
The Power of Commitment™

```
 1   A.    This is my morning prep for next week's council
 2         meeting.
 3   Q.    No, what your attorney's reviewing, he took from you.
 4                   MARKED FOR IDENTIFICATION:
 5                   DEPOSITION EXHIBIT 1
 6                   11:27 a.m.
 7                   MR. COUVREUR:    These are the -- what I sent
 8         him was some of the documents that are going to be
 9         produced, so I -- these are the articles of
10         organizations.
11                   MR. SMITH:    Okay.    So let me -- we'll go
12         through it.
13   BY MR. SMITH:
14   Q.    Okay.    This is -- I'm going to show you proposed
15         Plaintiff's Exhibit Number 1 for this deposition, and
16         pay atten -- it's a notice.    It says the reason you're
17         here, but it lists a bunch of documents I want you to
18         come -- to produce on the second page.
19   A.    Uh-huh.
20   Q.    They're numbered, I believe, and let's start have you
21         reviewed that document?
22   A.    I've reviewed this document, yes.
23   Q.    Okay.    So let's go through it.    Let's see what you
24         have for us today.    Do you have all the bank
25         statements for the NRI from June 2016 to the present?
```

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 19

1    A.    No.  I'm not in possession of the bank statements and

2          I don't keep the bank statements.

3    Q.    You're not -- I'm sorry, I don't -- you talk soft.  If

4          I was in a bigger room I'd put in my hearing aid, but

5          what did you say, you're not in a position to produce

6          them?

7    A.    Possession, I'm not -- I do not have the bank records

8          and I don't keep the bank records.

9    Q.    Who has them?

10   A.    We have a treasurer who keeps those records.

11              MR. COUVREUR:  And I asked the treasurer to

12         prepare them, okay, and I have them here for you.

13              MR. SMITH:  And you have them?

14              MR. COUVREUR:  I have them right here for

15         you.

16              MR. SMITH:  Okay.  So --

17              MR. COUVREUR:  Now, I do -- again, I'm

18         going to -- I'm not sure the relevance of this as to a

19         landlord/tenant case but our treasurer did prepare

20         these copies and we will give those to you.

21              MR. SMITH:  Can I see them?

22              MR. COUVREUR:  Oh, of course, but see, I'd

23         just -- Fred, when did you first see that?

24              THE WITNESS:  Which, the document?

25              MR. COUVREUR:  You know what, I --





FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 20

1

2       THE WITNESS:  When she -- I saw it

3   yesterday.

4       MR. COUVREUR:  And it -- okay.  All right.

5       MR. SMITH:  You can look at it if you want.

6       MR. COUVREUR:  All right.  So I just want

7   to make this clear then.  You know, these were

8   organized because -- I just want to make the record

9   clear that you said what, you didn't have possession

10  of them, right?

11      THE WITNESS:  No, I -- well, I did not have

12  possession of the bank documents or --

13      MR. COUVREUR:  So the treasurer was asked

14  to get that, so that's --

15      MR. SMITH:  Well, whether he has

16  possession, I mean, my position is --

17      MR. COUVREUR:  Here you go.

18      MR. SMITH:  -- that he should pro -- he

19  should get him or produce them --

20      MR. COUVREUR:  He got them.

21      MR. SMITH:  -- or you can object to it.

22      MR. COUVREUR:  No, no, no, so we got them

23  for you.  We got them for you.  What's your next

24  question?  Oh, so that covers items 1, 2 and 3 on your

25  list there.

        MR. SMITH:  Okay.  So you're -- Mr.

1    Couvreur, are you representing to me you just handed

2    me the bank statements from the NRI from June 2016 to

3    the present?

4            MR. COUVREUR:  Uh-huh.

5            MR. SMITH:  All records of payments.  I

6    assume there's copies of checks or something?

7            MR. COUVREUR:  No, there's no copies of

8    checks but there is a -- there's a --

9            MR. SMITH:  The section that --

10           MR. COUVREUR:  There's a ledger.

11           MR. SMITH:  -- says what -- there's a

12   ledger, okay.

13           MR. COUVREUR:  Yeah, there's not --

14           MR. SMITH:  Account summary.

15           MR. COUVREUR:  -- copies of checks.

16           MR. SMITH:  Okay.

17           MR. COUVREUR:  And the deposits.

18           MR. SMITH:  And the deposits, okay.

19   BY MR. SMITH:

20   Q.   Now let's go, Mr. Zorn, to the articles of

21        organization.

22   A.   Okay.  And then --

23   Q.   These are my copies?

24   A.   Yes.

25           MR. SMITH:  Can you mark these like 2 and




US LEGAL SUPPORT
The Power of Commitment™



1    you can just -- to save time, you can just like every

2    staple you can put -- if this is okay with you,

3    Counsel.  I believe you've broken it up.  I don't know

4    how -- they're broken down by year or something?

5        MR. COUVREUR:  No, they're each account.

6        MR. SMITH:  There's three accounts.  Two

7    accounts?  Is it okay if we mark them just as you have

8    stapled or do you want to remark -- I'm just trying to

9    save time?

10       MR. COUVREUR:  I don't care how you mark

11   them.  You can just call it one exhibit if you want.

12       MR. SMITH:  Well, let's mark them as

13   they're stapled.  I think they're statements by year

14   and then there's a ledger, two ledgers.

15       (Recess taken at 11:33 a.m.)

16   MARKED FOR IDENTIFICATION:

17   DEPOSITION EXHIBITS 2-5

18   11:36 a.m.

19       (Back on the record at 11:38 a.m.)

20   BY MR. SMITH:

21   Q.  Okay.  We're going through this list of requested

22   documents.  Number 40 is the articles of organization.

23       MR. COUVREUR:  Okay.  There they are.

24   BY MR. SMITH:

25   Q.  You're familiar with this document?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    A.    Yes, I am.

2    Q.    This is a -- who's Mitchell Simon?

3    A.    Mitchell Simon is one of the three directors of NRI,

4          L.L.C.

5    Q.    He's a director?  What --

6                MR. COUVREUR:  If I could, just to

7          actually -- he's a -- well, yeah, he's a -- if I may?

8          There's an operating agreement and he's a --

9    A.    He's a manager.

10               MR. COUVREUR:  Yeah.

11   A.    It's a term of art.

12   BY MR. SMITH:

13   Q.    Why don't -- it might be more efficient, do you -- all

14         these documents that you're producing, why don't we

15         just mark them now and get it over with.

16               MR. COUVREUR:  Do you want to mark that

17         as --

18               MR. SMITH:  Here, mark this.  And do you

19         have the operating -- wait, before you do that, let's

20         just go through this then I'll have you mark them and

21         then I'll ask him questions about them.

22   BY MR. SMITH:

23   Q.    Did you produce the operating agreement of NRI?

24   A.    My -- Joe Couvreur produced the document.

25   Q.    Well, he works for you, right?

Page 23

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    A.    Joe Couvreur works for NRI.

2    Q.    Just so I'm clear, because this is confused, what's

3          your position with NRI?

4    A.    I am a manager of NRI.

5    Q.    Okay.  And who's Mitchell Simon?

6    A.    He's another manager of NRI.

7    Q.    Are you co-managers?

8    A.    No, he's not co-managers.  There's three managers.

9    Q.    Are you getting manager and member mixed up?

10             MR. COUVREUR:  No, sir, if you look at the

11        operating agreement a member is the owner.  Now, you

12        could have an operating agreement -- I mean, I guess

13        you could have an entity operated by the member, but

14        in this instance, if you read that, this entity is

15        owned by Southfield Nonprofit Housing Corporation, and

16        that's the sole manager -- excuse me, a sole member.

17        The member's the owner, and then there's three

18        managers, but it's in that operating agreement.  I'll

19        let you take a few minutes and read it.

20    BY MR. SMITH:

21    Q.    Has this ever been amended, this operating agreement?

22    A.    Not that I've -- I do not believe it's been amended.

23    Q.    Does the NRI have meetings, regular meetings?

24    A.    Yes, sir, we do.

25    Q.    How often is that?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 25

1    A.    Weekly.  Every other week and as needed, but weekly.

2                    MR. COUVREUR:  Recently weekly.

3    A.    Recently weekly.

4    BY MR. SMITH:

5    Q.    Okay.  And then do you keep minutes of those meetings?

6    A.    Yes, we do.

7    Q.    Do you have the minutes?

8                    MR. COUVREUR:  We can take a minute, yeah.

9          What's the first one you're asking for, which minutes

10         are you --

11   BY MR. SMITH:

12   Q.    Are those all the minutes?

13   A.    Well, we had our board secretary, I gave her the

14         subpoena.  I believe all the minutes that have been

15         prepared, so which --

16   Q.    Are there some that are in the drafting stage?

17                   MR. COUVREUR:  But this is pretty -- oh,

18         yeah, here we go.  It's from July 2015 up until -- it

19         looks like up until December 5th.  Here, here's

20         another.

21   BY MR. SMITH:

22   Q.    Does the NRI communicate with the City of Southfield

23         in written form?

24   A.    In written form, no.

25   Q.    So the communication is because you work for



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 26

1    Southfield and you're manager so what you know
2    Southfield knows in a sense, right?
3    A.    You asked, for example, NRI has spoken and addressed
4          the Southfield city council neighborhood services
5          committee, so yes, we've had communication. We have
6          produced various documents as requested by the
7          neighborhood services -- city council neighborhood
8          services committee, so --
9    Q.    Was this a public meeting?
10   A.    Yes, it is a public meeting.
11             MR. COUVREUR:  Could I -- could I
12   interject, and I apologize for that?  In response to
13   your request I sent this to the board secretary and as
14   of 8 and 9 we do not -- I'm not prepared to say there
15   aren't any correspondence.  I think that she could not
16   locate any, but it's possible to -- I don't think
17   right now -- in fact, Fred, look at 7, 8 and 9.
18             THE WITNESS:  I'd want to -- I'd have to
19   scrub a lot of documents to, you know, go through and
20   take a look, but as a matter of routine NRI -- there
21   could be -- there is a presentation to city council, I
22   know that.  I need to go through that, but if you're
23   looking does NRI, NRI doesn't do a lot of
24   correspondence.  I mean, we...
25             MR. SMITH:  All right.  Let's just mark



1        these right now, okay?

2            COURT REPORTER:  You'll have to tell me

3    what to mark though?  I'm not sure.

4            MR. SMITH:  Can I see that?

5            MR. COUVREUR:  Yeah.  Yeah, those are the

6    minutes.

7            MR. SMITH:  Did you mark these yet?

8            COURT REPORTER:  No, I don't know which

9    one -- I don't know which numbers -- what to mark.

10           (Off the record at 11:46 a.m.)

11           MARKED FOR IDENTIFICATION:

12           DEPOSITION EXHIBITS 6-8

13           11:50 a.m.

14           (Back on the record at 11:50 a.m.)

15   BY MR. SMITH:

16   Q.    Okay.  I'm going to show you Exhibit Number 7, the

17   operating agreement.  Do you know how this -- well,

18   first of all, who signed this as president?

19   A.    Kenson J. Siver.

20   Q.    Okay.  And is that because he's the -- he's the

21   present mayor, right?

22   A.    Yes, he is.

23   Q.    Was he the mayor at the time you signed this?

24   A.    What date?

25   Q.    This was on August 23rd, 2016.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 28

1    A.    August 23rd, 2016?

2    Q.    If you know.

3          MR. COUVREUR:   I don't think he was the

4    mayor then.   Oh, no, the other mayor left, right?

5          THE WITNESS:   That's why I want to be

6    careful.

7          MR. COUVREUR:   He finished her term.

8          THE WITNESS:   I don't know exactly.

9    BY MR. SMITH:

10   Q.    Who's the primary, Brenda Lawrence?

11   A.    The -- no.   When Brenda Lawrence was elected to

12   Congress, Council President Fracassi became acting

13   mayor, or mayor --

14   Q.    Temporarily?

15   A.    No, he's named mayor until the next election, and

16   there was a -- there was an election -- there was an

17   election in November of '15, and what was the date on

18   that?

19   Q.    '16.

20   A.    So he would have been the mayor at that time, yes.

21   Q.    Okay.   So --

22         MR. COUVREUR:   Could you just clarify which

23   signature that is?   The signature of what?   Is that

24   the signature of a member?

25         MR. SMITH:   No, it says it's Southfield,



USLEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 29

1       sole member, yeah.  It says Southfield Neighborhood

2       Revitalization Initiative by Southfield Nonprofit

3       Housing Corporation.

4       BY MR. SMITH:

5       Q.      Okay.  So --

6               MR. COUVREUR:  So just to clarify, so that

7       was signed by the member, right?

8       BY MR. SMITH:

9       Q.      When did you -- do you remember signing this?

10              MR. COUVREUR:  No, but I just want to --

11      let's clarify, he didn't sign that in his individual

12      capacity, right, he signed that on behalf of the

13      Southfield Nonprofit Housing Corporation, right, Fred?

14              MR. SMITH:  That's what --

15              MR. COUVREUR:  Fred, can you clarify that?

16              THE WITNESS:  That's correct, the mayor

17      signed it as the sole member of the Southfield

18      Nonprofit --

19      BY MR. SMITH:

20      Q.      But he wasn't mayor at the time.

21      A.      But he signed it in the capacity as president of the

22      Southfield Nonprofit, of the Southfield Nonprofit

23      Housing Corporation.

24      Q.      Okay.  So let's -- explain to me like -- okay.  Were

25      you involved -- were you there when he signed it?





FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 30

1    A.    I don't know if I was there but I --

2    Q.    Do you remember signing that document?

3    A.    That is my signature and I signed as a manager.

4    Q.    Okay.  So explain to me -- let's just go to -- maybe

5         you can clear some things up.  What's your

6         understanding of -- this is a broad question but maybe

7         you can answer it and save us a lot of time?

8              What's the history or genesis of this whole

9         idea that Southfield was going to use the right of

10        refusal to get tax foreclosed homes and the NRI was

11        going to end up with title to them?

12   A.    The gen -- I'm not --

13   Q.    Did this idea come up -- well, first of all, how did

14        this come about, what do you remember about it?  Whose

15        idea was it, let's start with that?

16             MR. COUVREUR:  You know -- okay.  Jesus, I

17        just --

18             MR. SMITH:  I can break it.

19             MR. COUVREUR:  Yeah, break down the

20        question a little more, so is your question who

21        thought of this?

22             MR. SMITH:  Yeah, well, he can -- that's a

23        fair question.

24   BY MR. SMITH:

25   Q.    Who thought -- whose idea was this?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 31

1    A.    I'm not exactly sure who thought of it.  I can tell

2          you the genesis of the idea comes from these

3          properties -- the tax foreclosed properties and

4          spec -- people buying the properties, renting the

5          properties out, not putting a penny into the home and

6          bastardizing this community's housing stock.  So every

7          year 50-plus homes were being bought by people not for

8          individuals.  The majority were -- they became rental

9          properties with no investment creating and blighting

10         our community.

11   Q.    Okay.  So you say that the houses that went to tax

12         foreclosure were becoming rentals, is that your --

13   A.    The majority of them were becoming rental and we --

14   Q.    Now, what year are you talking about?

15   A.    If you go back from the foreclosure crisis of 2008,

16         '9, if you looked at what was auctioned off in those

17         years, in the earlier years, '08, '09, the County

18         wasn't foreclosing on properties, but when you start

19         looking at when they did foreclose and the auction

20         list of properties in Southfield is growing, the

21         majority of them were becoming speculative properties

22         with people immediately moving tenants in, not getting

23         certificates of compliance, not -- in certain cases

24         not paying taxes.

25               There's one property in the 2016 portfolio


US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.c.D.
February 6, 2018

Page 32

1    that was acquired a few years before by an entity as a

2    rental and the community -- the family -- the family

3    that was renting the property from the entity who

4    bought the foreclosed property a few years ago had

5    sewage in the basement and was pumping it out the back

6    yard.  There's example after example of where the

7    housing stock was being neglected with very little

8    investment in it.  So we saw this as an opportunity to

9    acquire the properties --

10   Q.   Who's we?

11   A.   The Southfield Nonprofit Housing Corporation.

12   Q.   Okay.  So let's step back.  So you -- you're saying

13   like a couple years after what some people call the

14   great recession when the housing market collapsed in

15   2008 that you were seeing tax foreclosed properties

16   that were, in your terms, not being taken care of, or

17   what did you say, blighted?

18   A.   The properties we acquired were tax foreclosed, all

19   of -- they were foreclosed and --

20   Q.   Well, but be careful when you say we because --

21   A.   Well, you need to --

22   Q.   -- I don't --

23   A.   -- be careful too.

24   Q.   -- know -- I'm not try -- I'm not quite sure you mean

25   we.


US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 33



1    A.    I got --

2    Q.    I mean, because you're --

3    A.    This is --

4    Q.    -- wearing -- you're wearing --

5    A.    I'm sorry, sir.

6    Q.    -- two hats I --

7    A.    I'm sorry, but --

8    Q.    -- know of right now.

9    A.    -- this is supposed to be about an eviction case.

10         MR. COUVREUR:   We're all over the place.

11   A.    I'm like so -- I'm just really --

12   A.    You're cast --

13         MR. COUVREUR:   I think he answered your

14   question though.   He told you why -- one reason the

15   homes were acquired, but again, what does that have to

16   do with an eviction case?

17         MR. SMITH:   Well, because we're trying to

18   get to how this occurred.

19         MR. COUVREUR:   How what occurred?

20         MR. SMITH:   This eviction, how we got to --

21         MR. COUVREUR:   Okay.   Ask that question,

22   why did this eviction --

23         MR. SMITH:   We -- I'm --

24         MR. COUVREUR:   -- how did we become the --

25         MR. SMITH:   I'm going to ask --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 34

1

2

3      BY MR. SMITH:

4      Q.      So what you're saying is -- you're telling me that

5              these tax foreclosed properties starting eight years

6              ago were blighted properties?

7                      MR. COUVREUR:      I don't think he said that.

8      BY MR. SMITH:

9      Q.      Is that what you're telling me?

10     A.      I did not say they were blighted properties.

11     Q.      Well, what are you -- what are you telling me?      You

12             gave me a few -- okay.

13                     Well, how would you characterize them?

14     A.      They were tax foreclosed properties.      They were

15             properties that --

16     Q.      Okay.  So --

17     A.      -- the individuals failed to pay their properties

18             (sic) and under Michigan law the County foreclosed.

19                     The City exercised its right of first

20             refusal.  The City, like a lot of other communities in

21             southeastern Michigan and across the state, have

22             various partners who are working to acquire these

23             properties, rehab the homes and get them back into

24             home ownership.

25     Q.      All right.  So you came -- whose idea was it for



USLEGAL SUPPORT
The Power of Commitment™

MR. COUVREUR:      -- owner of the property.

MR. SMITH:      -- some questions.

FREDERICK E. ZORN, JR., C.E.c.D.
February 6, 2018

Page 35

1       the -- wait, let's start at the most basic level.

2                      Whose idea was it to form Southfield

3       Neighborhood Revitalization Initiative?

4       A.      It was an idea of the Southfield Nonprofit Housing

5       Corporation.

6       Q.      Okay.  And so when -- when did -- who there came up

7       with the idea?

8       A.      Who?

9       Q.      Are you involved with the Southfield Nonprofit

10      Housing?

11      A.      Yes, I am.

12      Q.      What's your position with them?

13      A.      I am a board member and I believe I'm currently the

14      vice-president.

15      Q.      And how long have you been in that position?

16      A.      Pretty much since I've -- since, I'm going to say,

17      2008, 2009.

18      Q.      Okay.  So was it your idea to --

19                     MR. COUVREUR:  I think he answered that it

20      was the Nonprofit --

21      A.      It was the Nonprofit's idea.

22      BY MR. SMITH:

23      Q.      But a nonprofit consists of many people so whose idea

24      was it at the Nonprofit?

25      A.      The Nonprofit upon completion of a tax credit deal and


U.S. LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 36



1    restructuring and saving 400 and some apartments as

2    affordable and putting the properties through a 38

3    million dollar renovation found itself in the position

4    of having in excess of 10.5 million dollars, and as a

5    board we had a visioning session, what are we going to

6    do, what's our next project?  And one of the projects

7    the board identified was dealing with the number of

8    rental properties that were coming onto the community,

9    and in particular the number of tax foreclosed

10   properties that were being introduced to the community

11   with virtually no investment, and yes, blighting our

12   community.

13        I'm not saying they're blighted but those

14   homes, as they continue to deteriorate, were blighting

15   the community.  We have had homes with over $30,000

16   worth of mold damage in there where people living in

17   that home shouldn't have been living in there.  We

18   have done an awful lot of good with this program.

19   Q.   So what data did you base your decisions on?

20   A.   What data did we base our decisions on?

21   Q.   That were these -- you used the term blighted

22   properties coming on the market and you --

23        MR. COUVREUR:   No, no, he said tax

24   foreclosed properties.

25        THE WITNESS:   Foreclosed properties.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1  BY MR. SMITH:

2  Q.   Well, you said also rental and they may be different.

3       In your mind is there a difference between a rental

4       property and a tax foreclosed property?

5  A.   Yes, there is a difference.

6            MR. COUREUR:   I -- you know what, I -- I'm

7       sorry to interrupt but I think there's a misconception

8       here.  I think what he testified to is that many of

9       these tax foreclosed homes are picked up by

10      individuals who turn them into rentals and they're not

11      owner occupied.

12           MR. SMITH:   Okay.   Let's assume he's --

13      those were his words.

14  BY MR. SMITH:

15  Q.   Do you endorse what your counsel said?

16  A.   I agree with that statement.

17  Q.   Okay.   So what basis do you -- how do you know that

18      these tax foreclosed properties were being turned into

19      rentals?

20  A.   You could go through the preceding list before and see

21      how many of them were owner occupied or had different

22      names on them.

23  Q.   Well, did you do that or --

24  A.   Yes, that was done.

25  Q.   By whom?



U.S. LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 38

1    A.    I'm not exactly sure.  I may have had a clerk do it,

2          but a group worked on that.

3    Q.    You did it in your capacity as deputy mayor?

4    A.    I've never been deputy mayor.

5    Q.    I'm sorry, deputy administrator?

6    A.    I've never been deputy admin -- well, I was deputy

7          administrator.

8    Q.    What's your title again, I'm sorry?

9    A.    My -- no, you're having the confusion with the titles,

10         sir.  The title is city administrator.

11   Q.    City administrator, okay.

12   A.    Okay.

13   Q.    I'll remember it now.  Did you do this in your

14         capacity as city administrator?

15   A.    I -- well, first of all --

16               MR. COUVREUR:  Again, I'm going to continue

17         to object on, I just want to say, you know, the

18         relevance of this to this case at hand.  I don't know

19         where we're going.  Could we get back on track to

20         something that has to do with this?

21               MR. SMITH:  Okay.  We're getting there.

22   BY MR. SMITH:

23   Q.    Did you do it as city administrator?

24   A.    I don't even recall if I actually was the person who

25         did it.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 39



1  Q.  You just said you did it.

2  A.  No, I did not.  I said I may have had a staff person

3      do it.

4  Q.  Well, how do you -- you're making these decisions

5      about buying millions of dollars of property.  Are you

6      doing it just on anecdotal evidence or is there like

7      some --

8  A.  We bought -- in the 2016 --

9                     MR. COUVREUR:  Hold on, hold on.  What was

10     your question?  You're kind of making statements here.

11     What was that question just now, why did you buy the

12     properties, is that it?  Can you clarify your --

13 BY MR. SMITH:

14 Q.  Well, you're making a decision on buying millions of

15     dollars worth of tax foreclosed properties and you're

16     saying because they're turning into rentals, if I'm

17     understanding you, or they're blighted or -- okay.

18                   Let me ask you simply:  Why did you buy --

19     why did Southfield Nonprofit Housing Corporation buy

20     these tax foreclosed properties?

21 A.  They did not.

22 Q.  They put up the money for it, right?

23 A.  They put up the money but the entity that acquired the

24     properties was not the Southfield Nonprofit Housing

25     Corporation.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1   Q.   The City was?

2   A.   No, the City did not put up the money.

3   Q.   No, the City acquired them though?

4   A.   The City simply exercised --

5   Q.   Well, let's just establish a base.  The City of

6        Southfield, who decided to exercise the right of first

7        refusal in 2016, right?

8   A.   Okay.

9   Q.   For about, what, 71 properties maybe?

10  A.   I don't know if that's the exact count.

11  Q.   Somewhere between 50 and 70 properties, 55 properties?

12  A.   I don't -- you know, I don't recall the exact number.

13  Q.   Okay.  So -- but it was less than 100?

14            MR. COUVREUR:  Well, look, he said he

15       doesn't know the amount.

16            MR. SMITH:  Well, I'm just saying it was

17       less than 100.

18            MR. COUVREUR:  No, you're trying to nail

19       him down on a number.

20  BY MR. SMITH:

21  Q.   Well, don't you have records of what you bought?

22  A.   We have records.  I don't have them in front of me.

23  Q.   Okay, fine, so let's go ahead.

24  A.   Okay, fine.

25  Q.   So you -- the City of Southfield exercised their right

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 41

1   of first refusal under the general property tax act in

2   2016, right?

3   A.   Is that a question?

4   Q.   Yeah.

5   A.   We did exercise our right of first refusal.

6   Q.   Okay.  And --

7   A.   And we being the City of Southfield.

8   Q.   And whose idea was that?

9   A.   Well, as administrator I signed off on the

10       recommendation.

11  Q.   Was it your idea?

12  A.   I've -- it was not my idea individually, no.

13  Q.   Well, whose idea was it?

14  A.   This --

15  Q.   Whose -- who were --

16  A.   I have said --

17  Q.   -- the people involved in the decision?

18  A.   The Southfield Nonprofit, the city council was

19       involved in it.

20  Q.   What about the mayor?

21  A.   The mayor was involved in it but the mayor doesn't

22       have a vote.

23  Q.   Who propose -- who proposed it to the city council?

24  A.   I wrote -- as city administrator I signed the

25       recommendation.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 42



1  Q.   Okay.   And so this was back -- and you did that in

2       when, June of 2016?

3  A.   I don't know the exact.   It was in 2016.

4  Q.   And you did the same thing in 2017?

5  A.   Yes, to -- we exercised our right of first refusal, we

6       being the City.

7  Q.   Okay.   But when you sign -- when you -- when the City

8       of Southfield under your recommendation decided to

9       exercise the right of first refusal you knew where you

10      were going to get the money from, right?

11  A.  The money was coming from the Southfield Nonprofit.

12  Q.  And you knew that in advance?

13  A.  Yes, we did.

14  Q.  And -- okay.   So -- and you -- there were discussions

15      at the Southfield Nonprofit Housing Corporation that

16      they would advance over the two years a million and a

17      half dollars?

18  A.  To NRI, yes.

19  Q.  Okay.   And so --

20           MR. COUVREUR:   Well, now wait a minute.

21      You quoted an amount of money.   I don't know where

22      that number came from but --

23           MR. SMITH:   The minutes.

24           MR. COUVREUR:   What are you asking him

25      to --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 43



1          MR. SMITH: Approximately one year --

2          MR. COUVREUR: Just -- well, not the -- are

3    you just saying that Southfield -- I just want to

4    clarify that. You said a lot of things that you're

5    asking him to agree to.

6    BY MR. SMITH:

7    Q.   The Nonprofit had agreed before you went to city

8         council to --

9                    MR. COUVREUR: To advance money.

10   BY MR. SMITH:

11   Q.   -- advance the money to buy these tax foreclosed

12        houses in both years?

13                   MR. COUVREUR: Yes.

14   A.   The Southfield Nonprofit did agree to advance those

15        funds, yes.

16   BY MR. SMITH:

17   Q.   Okay. And how are they going to get their money back,

18        what was the deal; was there a contract?

19   A.   The money -- the money -- how was -- first of all,

20        they're not -- the objective is to renovate the homes

21        and resell them, but they're losing money and we've

22        gone into this venture losing money. The objective is

23        to push the comp values back of our rental rates in

24        the community. That's one of the objectives, to

25        eliminate blight, enhance home ownership.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 44



1          MR. COUVREUR:  All right.  Fred, if you
2     could just kind of --
3     BY MR. SMITH:
4     Q.    Okay.  But how are you getting --
5          MR. COUVREUR:  I'm trying to stick --
6     BY MR. SMITH:
7     Q.    You can answer --
8          MR. COUVREUR:  -- to your question.
9     BY MR. SMITH:
10    Q.    -- how are you getting your money back, the Nonprofit?
11          Sir, there's got to be something in
12    writing.  They didn't just like gratuitously give the
13    City a million and a half dollars.  You're smiling but
14    what's the answer?
15    A.    You're smiling is really a disingenuous remark --
16          MR. COUVREUR:  Yeah.
17    A.    -- and it says nothing into the record.
18    BY MR. SMITH:
19    Q.    No, smiling's good.
20    A.    I mean, it's -- but to incorporate my body language
21    into this is really a cheap shot.
22    Q.    Okay.  I'm not --
23    A.    You know that.
24    Q.    I'm not trying to.
25    A.    No, you've --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 45



1   Q.   I just want to answer the question.

2   A.   I could sit here and say gosh, your body language has

3        been sloppy and hostile towards me all morning.  I've

4        been a gentleman, hands folded, engaged in this

5        conversation, but your body language has been

6        disruptive and rude, so quid pro quo.

7   Q.   My body language?

8   A.   Pardon?

9   Q.   My body language is --

10  A.   I would -- yeah, and the smirk --

11  Q.   Well, my words --

12  A.   -- you have on --

13  Q.   -- haven't been.

14  A.   -- your face right now.

15  Q.   Okay.  Okay.  Let's -- let's just try to -- let's just

16       try to do our jobs here.

17            Okay.  So I'm trying to --

18            MR. COUVREUR:  Well, again, and I again ask

19       where this -- what this has to do with a

20       landlord/tenant action?

21            THE WITNESS:  Yeah, because I -- you know,

22       it's --

23  BY MR. SMITH:

24  Q.   Okay.  So, yeah, I'm asking you -- I'm getting there

25       and I'm -- we'll get you out of here in time for his

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1        next commitment.

2                Is there something in writing that details

3        the transaction between the Southfield Nonprofit

4        Housing and the City of Southfield?

5   A.   There's a council resolution authorizing that the City

6        would exercise its right of first refusal and then

7        transfer the property to the Southfield Neighborhood

8        Revitalization Initiative, L.L.C.

9   Q.   Why was it necessary to form a separate entity?

10  A.   One, the City did not have the money to undertake the

11       activity.

12  Q.   Why didn't the Southfield Nonprofit get title since

13       they advanced the money?

14  A.   Because it's consistent with their role and mission

15       and because they advanced the money, and the

16       Southfield Nonprofit did not get title.  NRI got

17       title.

18  Q.   Whose idea was it to set up a separate entity?

19  A.   I don't exactly recall.

20  Q.   Doesn't the Southfield Nonprofit have a charter that

21       it's just supposed to do senior housing?

22  A.   No.

23  Q.   Wasn't it originally started by Gilbert Silverman just

24       to help senior housing?

25  A.   I don't know who originally started it.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 47



1   Q.   You don't know anything about the history?

2   A.   Well, I know Gilbert Silverman, I knew Gil before he

3        passed.

4   Q.   But why do you think this organization could

5        basically -- did you ever get a legal opinion that it

6        was permissible for someone other than the City to end

7        up with title to the tax foreclosed properties that

8        were -- by exercising the right of first refusal?

9   A.   The City did get title first, then the City

10       transferred --

11  Q.   Did you get a legal opinion that it was okay to

12       transfer them to the NRI?

13  A.   I don't believe we have a legal opinion.

14  Q.   But you made the decision that it was okay, right?

15  A.   The transfer went from the City, upon our ability to

16       clear the title it went to NRI.  That was the

17       agreement and the resolution with city council.

18  Q.   Were you at the council meeting where the city

19       attorney, Ms. Ward, explained the transaction?

20  A.   I would need to know the date and see the minutes to

21       know if I was in attendance.

22  Q.   It was in June 23rd, 2017.

23  A.   I would need to see the minutes to see if I was in

24       attendance.  I probably would look at my own calendar,

25       as well.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 48



1    Q.    You should have brought them.  Okay.  So now let's

2          talk about the Boyd house.  Do you have any

3          information to -- where's your complaint?

4                     The house at 30280 Woodgate Drive,

5          Southfield, Michigan where Stefanie Boyd lives, are

6          you familiar with that house?

7    A.    No, I'm not familiar with that house.

8    Q.    Do you have any information that it was blighted?

9    A.    I am not familiar --

10   Q.    Or it was --

11   A.    -- with the house.

12   Q.    -- a rental?

13                     MR. COUVREUR:  I think he said he's not

14         familiar with that house, so he answered your

15         question.

16   BY MR. SMITH:

17   Q.    Well, you could be -- did you ever check with code

18         enforcement if there were any ordinances -- of

19         ordinance violations on these houses -- on this

20         particular house?

21   A.    I don't know if I checked on that particular house,

22         no.

23   Q.    So you just assume that it was blighted because it was

24         tax foreclosed?

25                     MR. COUVREUR:  What -- that's a -- I think

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



```
 1        it's --
 2
 3                     MR.  SMITH:  That's a leading question, it's
 4        okay.
 5
 6                     MR.  COUVREUR:  Not only is that leading,
 7        it's -- no, no, it's not misleading, it's confusing
 8        because --
 9
10                     MR.  SMITH:  It's leading.
11
12                     MR.  COUVREUR:  -- it's one of those
13        questions where, you know, it's like do you still beat
14        your wife.
15
16                     He never said that house was blighted.
17
18        That was your question.
19
20        BY MR.  SMITH:
21
22        Q.  Well, do you have any -- it was -- let me rephrase it.
23
24                     MR.  COUVREUR:  I mean, and I don't -- I'm
25        not quite sure why you keep going back to this blight
```

1        it's --
2                     MR.  SMITH:  That's a leading question, it's
3        okay.
4                     MR.  COUVREUR:  Not only is that leading,
5        it's -- no, no, it's not misleading, it's confusing
6        because --
7                     MR.  SMITH:  It's leading.
8                     MR.  COUVREUR:  -- it's one of those
9        questions where, you know, it's like do you still beat
10       your wife.
11                    He never said that house was blighted.
12       That was your question.
13       BY MR.  SMITH:
14       Q.  Well, do you have any -- it was -- let me rephrase it.
15                    MR.  COUVREUR:  I mean, and I don't -- I'm
16       not quite sure why you keep going back to this blight
17       issue.  These homes, the individuals lost their
18       ownership due to nonpayment of taxes, not due to it
19       being blight, so I'm not sure what --
20                    MR.  SMITH:  Well, we're --
21                    MR.  COUVREUR:  -- the blight issue has to
22       do with the eviction.
23                    I mean, this could have been a pristine
24       house but they still could have lost it in a tax sale,
25       but --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1              MR. SMITH:  Do you --

2              MR. COUVREUR:  -- I believe he testified he

3    doesn't know --

4              MR. SMITH:  Do you want --

5              MR. COUVREUR:  -- the condition of --

6              MR. SMITH:  -- to testify, you'd make a

7    great witness?

8              MR. COUVREUR:  I don't know about a great

9    witness.  All right.

10   BY MR. SMITH:

11   Q.   Okay.  So let me ask this, do you understand for

12        the -- you have three hats here.  You're on the NRI,

13        you're on the Southfield Nonprofit and you're the city

14        administrator, right?  Okay.  So I'm asking you this

15        question as the city administrator.  Do you understand

16        that the City of Southfield is only supposed to

17        exercise its right of first refusal if there's a

18        public purpose?

19   A.   The answer is yes, and the public -- well, yes.

20   Q.   You understand that?

21   A.   I believe I do, yes.

22   Q.   And did you understand that before you recommended

23        that the City of Southfield --

24             MR. COUVREUR:  Well, again, I'm going to

25        object to that question because now you said when you

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 51

1  recommended.  You're making a comment.  It's one of

2  those --

3       MR. SMITH:  He said he made a

4  recommendation previously.

5       MR. COUVREUR:  Go ahead, continue with your

6  question.

7  BY MR. SMITH:

8  Q.  So you -- when you made the recommendation you

9  understood that you had to have a public purpose?

10 A.  I believe I did, yes.

11 Q.  Okay.  And I assume you're going to say your public

12 purpose is that it was it blighted, or what was the

13 public purpose?

14 A.  The public purpose was to stop, as with all of the tax

15 foreclosed homes, the volume of homes that were

16 becoming rentals with no investment and falling and

17 further deteriorating into blighting situations.

18 Q.  Well, but last year we were only talking about 45

19 homes.  What's the City -- how many structures are

20 there in the City of Southfield?

21 A.  Single-family homes is a little over 17,000.

22 Q.  It doesn't even go to a hundredth of a percent, I

23 don't think.

24 A.  There's a tipping point.  That's sloppy math.  The

25 number of rentals in this community, we could pull the



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 52



1    numbers but we have whole neighborhood associations
2    that are going through and recognizing that in excess
3    of 50% of their neighborhood is now a rental.  So as a
4    community we are concerned about the number of
5    rentals.  We would much rather have owner occupancy,
6    but more importantly, we simply want to have homes
7    that are brought up to code that are decent.  You
8    know, we're concerned about public safety and health.
9    Q.   Do you know if any officers or board members of the
10       Southfield Nonprofit Corporation own rentals in
11       Southfield?
12   A.   Do I know if any of them do?
13   Q.   Yeah.
14   A.   I don't know.
15   Q.   Okay.   So before -- before you made the recommendation
16       to purchase -- to have the City of Southfield exercise
17       the right of first refusal to buy approximately 50
18       houses the last two years each year, did you ever
19       check to see if there was any code enforcement done on
20       any of the homes?
21   A.   The list as it's produced by the County when we get
22       it, we do do are there violations in that, yes.
23   Q.   Do you have a report?
24   A.   I believe we've got like a tab sheet on each.  I'm not
25       sure it's -- if you want to call it a report.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 53

1    Q.   Did you have it before you made the recommendation?

2    A.   Did I -- I don't understand the question, did I ever

3         what?

4    Q.   Did you ever -- you're recommending to the city

5         council to purchase these properties because -- I'm

6         not -- in various times in your testimony either

7         they're rentals or because they're blighted.

8    A.   No, I've never said that.

9    Q.   Well, what are you saying then, what's the purpose? I

10        thought you just said because they were rentals or

11        they're blighted?

12   A.   That's not what I said.

13   Q.   Well, tell me what you said?

14             MR. COUVREUR:   Well, read it back.   Let's

15        go back.

16             COURT REPORTER:   What am I looking for?

17             MR. SMITH:   I think it was like five or ten

18   minutes ago.

19             (Off the record at 12:22 p.m.)

20             (Back on the record at 12:25 p.m.)

21             MR. SMITH:   Let's go back on the record.

22   BY MR. SMITH:

23   Q.   Just simply put, what is the reason you recommended

24        the City of Southfield buying tax foreclosed

25        properties the last two years?



US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 54

1  A.  The reason is to reduce the number of properties that

2      are becoming rentals and to reduce the blight that

3      these properties become.

4  Q.  Okay.  So my question is what data did you have that

5      the houses were rentals?

6  A.  I'm not saying they're rentals.  As I said --

7  Q.  Okay.  So what --

8  A.  -- the objective --

9  Q.  -- what are you saying, that they could become

10     rentals?

11  A.  That's correct, to reduce the --

12  Q.  Okay.  I -- okay.  Now I understand where you're

13     trying to go with this.

14  A.  Some of them may have been rentals.  We don't know

15     that.  I mean, I didn't -- you know.

16  Q.  So you don't know if they're rentals but did you know

17     if they were blighted?

18  A.  Did I know if they were blighted?

19  Q.  Yeah.

20  A.  When we get the list of properties we go through, we

21     do a quick -- we have a short amount of time to act on

22     this from Oakland County.  We do a quick analysis.  We

23     go through code violations, is there a history.  We do

24     put some info -- whatever information we have, we do

25     our best to gather it on each property.



US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 55



1  Q.  You're -- when you say we who are you talking about?

2  A.  Myself and my staff.

3  Q.  Which people on your staff?

4  A.  I could have people working on it in building, GIS,

5      code enforcement.

6  Q.  What's their names?

7  A.  I would have -- I could have had Maria Calhoun working

8      on it, her team of code people.  I could have had

9      Sally Price from GIS, Steve from GIS, my building

10     department.  I could have had a number of people

11     working on this.

12  Q.  Do you have a written report?

13  A.  We have a tab on -- basically a profile sheet on each

14      property.

15  Q.  Can you produce it?

16  A.  We probably can, yes.

17  Q.  Okay.  I'll ask your counsel for that.  So explain to

18      me like -- so the NRI gets deeded the property for $1

19      from the City of Southfield; is that your

20      understanding?

21  A.  After the City receives the title, we work to clear

22      the titles and then they're deeded to NRI.

23  Q.  Does the Oakland County treasurer know that you're

24      doing this?

25  A.  I don't know that.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 56

1    Q.   Have you ever talked to the Oakland County treasurer?

2    A.   Yes, I have.

3    Q.   About this?

4    A.   About -- I don't know what you mean by this.

5    Q.   About buying these tax foreclosed properties?

6    A.   Yes, I have.

7    Q.   And what was the substance of your conversation?

8    A.   I don't recall -- you know, I've had conversations. I

9         don't recall the substance of my conversations.

10   Q.   Well, were you the one who talked to them about how

11        you -- getting the money?

12                  MR. COUVREUR:   I think he answered the

13        question, your question.

14   BY MR. SMITH:

15   Q.   You have no recollection of what you talked about?

16   A.   I have lots of conversations with lots of people.

17   Q.   Well, I'm talking about this topic about buying the

18        tax foreclosed --

19   A.   No, but, you know, I can tell you it's happening

20        throughout southeastern Michigan --

21   Q.   I'm asking --

22   A.   -- and you're --

23   Q.   -- what you recall?

24   A.   You want to know what the difference is?   The

25        difference is a legitimate 501(c)(3) that's not making


U.S. LEGAL
SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    a profit --

2                      MR. COUVREUR:   All right.   Fred, Fred,

3    stop.

4    BY MR. SMITH:

5    Q.     Well -- okay.   So you -- let me understand this.   So,

6    first of all, how many people work for the Southfield

7    Neighborhood Revitalization?

8                      MR. COUVREUR:   What does that have to do --

9    I guess the relevance of this and continuing this, how

10   many people --

11   BY MR. SMITH:

12   Q.     I'm just asking how many people work for?

13   A.     To which entity?

14   Q.     What?

15   A.     To answer --

16   Q.     For NRI, what you call NRI?

17   A.     NRI doesn't have any employees.

18   Q.     Well, how do you serve -- like you have people going

19   out like -- don't you have people going out and

20   checking on the houses?

21   A.     We do, but not City employees.

22   Q.     No, I'm -- how many people work for the Southfield

23   Neighborhood Revitalization Initiative, how many

24   employees?

25   A.     I just -- I just answered that.


US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 58



1                    MR. COUVREUR:    He just answered there

2    are --

3    BY MR. SMITH:

4    Q.    You said they don't have any employees?

5                    MR. COUVREUR:    No employees.

6    A.    Southfield NRI has no employees.

7    BY MR. SMITH:

8    Q.    It has no employees, so who does their work?

9    A.    We have a contractual arrangement with Habitat For

10   Humanity, Oakland County.

11   Q.    So they do their work.    So can you think of any reason

12   why like Jerry Witkowski would get a check for a check for $2,500?

13   A.    Jerry Witkowski would get a check for 25 --

14   Q.    Yeah, from the NRI?

15   A.    Not from NRI.

16   Q.    You don't have any knowledge of that?

17   A.    No, and it --

18   Q.    Who writes the checks for --

19                   MR. COUVREUR:    You know what, I guess I'd

20   just like to -- if you could put something in front of

21   him and let him explain what that is.    I know that --

22   and find out exactly what that is, but I think Fred

23   testified he has no knowledge of that.

24   BY MR. SMITH:

25   Q.    Do you write the checks for the NRI?



1   A.   No, I do not.

2   Q.   Who does?

3   A.   Mitchell Simon does.

4   Q.   And what's Mitchell Simon's -- he's the president of

5        the Nonprofit?

6   A.   No.

7   Q.   What's his role with them?

8   A.   With what entity?

9   Q.   Southfield Nonprofit Housing Corporation.

10  A.   No, he's not the president.

11  Q.   Who's the president, the mayor?

12  A.   Ken Siver is the president.

13  Q.   And the mayor of Southfield?

14  A.   But not in capacity as mayor.

15  Q.   Okay.  What's Mitchell Simon do?

16  A.   Mitchell Simon is the treasurer of --

17  Q.   Oh, I see.

18  A.   -- Southfield Nonprofit.

19  Q.   How long has he been the treasurer?

20  A.   I don't know exactly how long.

21  Q.   So he writes the checks?

22  A.   Yes.

23  Q.   Okay.  So how does -- does Witkowski do anything for

24       them?

25  A.   For them, being who?

US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 60



1  Q.   The NRI.

2  A.   Witkowski is being re -- the City of Southfield is

3       being reimbursed for time that Jerry Witkowski may

4       spend in the interim period before a property is

5       turned over to Habitat For Humanity, and the turnover

6       time, you know, from when we get a property to when we

7       work to get an eviction Jerry Witkowski is being

8       reimbursed -- the City of Southfield is being

9       reimbursed for Mr. Witkowski's time.

10 Q.   Who does he work for normally?

11 A.   Normally he works for myself on special projects.

12 Q.   Was he a code enforcement official?

13 A.   He was the director of code, yes.

14 Q.   And now he's retired?

15 A.   He's retired.

16 Q.   Okay.  So this house here that we're here on, this

17      Woodgate Drive, has it -- to the best of your

18      knowledge has anyone ever been inside the house?

19 A.   Has anyone ever?  I'm sure someone has been inside of

20      the house.

21 Q.   I mean any -- anyone from any of the organizations

22      you're involved with, so let's start with City of

23      Southfield?

24 A.   I would like to think that when the house was built

25      the City of Southfield did an inspection and from time

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1       to time we did for --

2   Q.  Well, I'm talking about what you know and not

3       speculation?

4   A.  To my -- to my -- I don't know if the City's -- I

5       don't know.

6   Q.  And you have no knowledge it's blighted?

7   A.  I know that the property was tax foreclosed on.

8   Q.  But you don't think that tax foreclosed means it's

9       necessarily blighted, do you?

10  A.  It depends upon which part of the Michigan statute

11      you're looking at.

12  Q.  Well, what does the statute have to do with it?  I'm

13      just asking a fact question.  What does the statute

14      have to do with it?

15  A.  Under Michigan law tax foreclosed properties are --

16      can be deemed blighted under the Brownfield

17      legislation.

18  Q.  You just -- because the taxes aren't paid it means

19      that they're blighted.  You're saying that that's

20      in --

21  A.  Any tax foreclosed property is eligible in core

22      communities under the Brownfield statute to become --

23      to be titled blighted.

24  Q.  Is the Brownfield statute, I'm not that familiar with

25      that, is that a Federal or a State statute?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 62



1    A.    It's a State.

2    Q.    Isn't that supposed to deal with environmental issues?

3    A.    It does, and when we find a house loaded with mold and

4          we go in and we do an environmental inspection on

5          every home or have to tear it down, it provides us a

6          mechanism to cover those costs.

7                MR. COUVREUR:  Well, it also covers things

8          that aren't necessarily environmental contamination.

9          If you had a dilapidated building you could -- it

10         covers rehab as well as environmental, but I'm

11         digressing on you, but I was just answering your

12         question.

13   BY MR. SMITH:

14   Q.    Do you think there's any public purpose in acquiring a

15         house that's up to code and has no ordinance

16         violations?

17   A.    If it's tax foreclosed, are you -- is the house tax

18         foreclosed?

19   Q.    Well, these ones are.  So you're saying tax foreclosed

20         automatically means it's blighted?

21                MR. COUVREUR:  No.

22   A.    No, I'm not.  You're saying that.

23   BY MR. SMITH:

24   Q.    What are you saying?  I'm just -- tell me what you're

25         saying?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1    A.    You're -- repeat the question.

2    Q.    What's the cor -- what's the correlation?

3    A.    I don't have a question out of any of that.  What's --

4    Q.    You don't know -- so there is no correlation?

5    A.    That's your statement.

6    Q.    I'm asking you --

7    A.    There's no question.

8    Q.    -- what is the correlation?

9               What's the -- okay.

10              MR. COUVREUR:   Could I just take a little

11   break with Fred just for a moment?

12              THE WITNESS:   Yeah.

13              (Recess taken at 12:36 p.m.)

14              (Back on the record at 12:38 p.m.)

15   BY MR. SMITH:

16   Q.    All right.   So if you -- has the NRI sold any houses?

17   A.    Yes, we have.

18   Q.    How many?

19   A.    I don't know the exact count.

20   Q.    Approximately?

21   A.    20.

22   Q.    And then you sell them for -- you sell them at

23         fair-market value, right --

24   A.    Yes, we do.

25   Q.    -- or as much as you can get?

Page 63

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 64

1                    Okay.   So where's the money go?

2    A.   The money goes to NRI.

3    Q.   And then does it go back to the Nonprofit?

4    A.   The question of timing on sales, the sales go to NRI

5    and at a certain point the money can go back to the

6    Nonprofit.

7    Q.   Well, are there rules or is it just like ad hoc?

8    A.   It's --

9    Q.   Isn't there --

10   A.   It's --

11   Q.   -- like a formula or --

12   A.   There's no formula.   It's a very fluid process, I

13   mean, we're -- we bought a portfolio in '16, bought a

14   portfolio in '17, and as we work our way through each

15   portfolio we're learning as we go.

16   Q.   Who's the real estate broker?

17   A.   The real estate?   Multiple real estate brokers.

18   Q.   She's one of your managers, this woman, I don't know

19   how you say her name, Ms. Libett Etole (phonetic)

20   or --

21   A.   Yvette Etole (phonetic).

22   Q.   Yeah.   She's a real estate broker, right?

23   A.   Yes.

24   Q.   Does her firm list any of the --

25   A.   No.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 65



1    Q.   Has it ever?

2    A.   I do not --

3             MR. COUVREUR:  Again, you know what,

4         this -- what does this have to do with a

5         landlord/tenant action?  I mean, he can answer that

6         but I just -- it seems like you're fishing for your

7         other lawsuit.

8    A.   I do not believe that her firm has listed any

9         properties.  In the 2016 portfolio the majority of the

10        listings were handled by a broker with Habitat For

11        Humanity.

12   BY MR. SMITH:

13   Q.   What's the relationship between Habitat With Humanity

14        and the NRI?

15   A.   They are the general contractor responsible for the

16        renovation, writing a scope of work, facilitating the

17        renovation.  We also -- a number of the homes are

18        placed into the Habitat For Humanity portfolio for

19        their client base.

20   Q.   So they get paid for renovating the house, right?

21   A.   They receive a -- they receive compensation as the

22        general contractor.

23   Q.   What if the house doesn't need any work?

24   A.   We've yet to have a house that doesn't need any work.

25   Q.   Explain to me these documents you produced for me.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1    For instance, Exhibit Number 2, it's a bank account at

2    Fifth Third that ends in 4329, and is this your

3    general operating account, or how would -- how would

4    you characterize that account?

5    A.    Well, the statement says that it's the Southfield

6    Neighborhood Revitalization Initiative, L.L.C.   It's a

7    bank statement from Fifth Third and the account number

8    ends in 4329.

9    Q.    Do you see these statements on a usual balance -- I

10   mean, on a regular basis?

11                MR. COUVREUR:   Do you?

12   A.    I don't see the bank statements, no.

13   BY MR. SMITH:

14   Q.    Okay.   So that's one account.   So what's -- what's

15   this other account?   It's a different number.   What's

16   the difference, if you know?

17   A.    Oh, I don't know.   However, there was a situation with

18   the bank where we had to change account numbers.

19   That's how -- I don't know.

20                MR. COUVREUR:   Fred, if you know, you know.

21   If you don't know, you don't know.

22   BY MR. SMITH:

23   Q.    Well, here's a different account too, so...

24   A.    I don't know.

25   Q.    Do you know if they have an escrow account?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1    A.   They being who?

2    Q.   The NRI.

3    A.   No, I do not know.

4    Q.   You're getting -- like here's a statement under

5         Exhibit 5 from November 2017.  They're transferring

6         like -- like on the 7th, $108,000 to -- I don't know

7         where they're transferring to.  Do you have any idea

8         where they're transferring?

9         A.   No, I don't know.

10   Q.   Who would know, Mitchell Simon?

11   A.   Mitchell Simon would know.

12   Q.   And then like -- in this account you have a money

13        market with over a million dollars in it.  Do you know

14        where that money came from?

15   A.   No.  What account is this?  I'm not familiar with this

16        account and I don't know where the money came from.

17   Q.   So, I mean, at the most basic level you don't know

18        where -- when they sell a house you don't know where

19        the money's going, or do you?  Where's the money

20        going?

21   A.   When a home is sold it goes back to NRI.

22   Q.   But then the NRI is transferring -- transferring money

23        to -- in the last couple months they transferred over

24        $100,000 -- or $150,000.

25   A.   We could --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 68

1    Q.   Do you know what this account is, 6472?

2    A.   I don't know.

3    Q.   Have you ever been reimbursed any expenses or gotten

4         any money from the NRI?

5    A.   No, sir, I haven't.

6    Q.   What about the Southfield Nonprofit?

7    A.   I've not received any reimbursements from Southfield

8         Nonprofit.

9    Q.   So the only money you receive is your salary from City

10        of Southfield?

11   A.   That's correct.

12   Q.   And do you own any property in the City of Southfield?

13   A.   No, I do not.

14   Q.   You were present at a city council meeting on December

15        4 of 2017.  Do you recall that?

16   A.   Again, I'd like to see minutes and see.  I most likely

17        was present.

18   Q.   Well, I saw you there.  Do you know that they -- at

19        that meeting there was a resolution that these tax

20        foreclosed people, house owners could --

21             MR. COUVREUR:  Again, I'm going to object.

22        What does --

23   BY MR. SMITH:

24   Q.   -- could buy their --

25             MR. COUVREUR:  -- that have to do with --



US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 69

1   BY MR. SMITH:

2   Q.    -- houses back --

3               MR. COUVREUR:    -- a landlord/tenant case?

4   BY MR. SMITH:

5   Q.    -- in 2018; do you know about that resolution?

6   A.    Council took -- we need to look at the minutes.

7         Council took an action, the final action I believe did

8         not pass, nor would it be binding on our NRI.

9   Q.    I thought it passed but it wouldn't be binding?

10  A.    No.

11              MR. COUVREUR:    Well, I think you answered

12        that, Fred.

13  BY MR. SMITH:

14  Q.    Has Mandelbaum ever been a manager of the NRI,

15        councilman?

16  A.    No, sir, he hasn't.

17  Q.    Does he have any involvement in it?

18  A.    In what?

19  Q.    The NRI.

20  A.    He is -- he is a -- he is the council representative

21        to the Southfield Nonprofit Housing Corporation.

22  Q.    Are you aware that the majority of these tax

23        foreclosed properties didn't have mortgages on them?

24  A.    No, I'm not aware of that.

25  Q.    You've never been aware?




1    A.    Most -- most --

2                MR. COUVREUR:    I think you answered that,

3          Fred.

4    A.    All right.    I -- you know that most banks step in and

5          deal with the --

6                MR. COUVREUR:    Fred, I think -- all right.

7    BY MR. SMITH:

8    Q.    I do know that.    So you do -- so you did know that

9          most of them didn't have mortgages?

10   A.    No, I did not know that.    I do not know the mortgage

11         status of these properties.

12   Q.    Has the NRI ever bought a house that had a mortgage on

13         it?

14   A.    Not to my knowledge.

15   Q.    Would the NRI -- has the NRI ever allowed any of the

16         prior owners of the properties that were tax

17         foreclosed to buy them back from the NRI for the

18         taxes?

19   A.    Repeat the question?

20   Q.    Has the NRI ever let any of the foreclosed occupants

21         of the houses purchase them back, the title back?

22   A.    Not to my knowledge.

23   Q.    Who came up -- do you know anything about a policy of

24         giving people cash for keys with the NRI?

25   A.    What's the question?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    Q.    Is there a policy where you give people cash for keys?

2    A.    We have done cash for keys, yes.

3    Q.    Do you have a policy on it?

4    A.    I don't believe we formally have a written policy.

5    Q.    Have you ever talked to people prior to the City of

6          Southfield getting title and given them any options on

7          how to get their taxes current?

8    A.    That's two questions.  You need to break that down for

9          me.

10   Q.    Have you personally talked to people who are facing

11         tax foreclosure?

12   A.    Facing?

13   Q.    Yeah.

14   A.    No.

15   Q.    Did you ever talk to any of the people who lost their

16         houses to tax foreclosure and asked if there's any way

17         they could get them back?

18   A.    Again, there's a couple questions in there.

19   Q.    Have you ever talked to people that had their houses

20         foreclosed --

21   A.    Yes.

22   Q.    -- in tax foreclosure?

23   A.    Yes, I have.

24   Q.    And these were people that the NRI ended up with title

25         to their house?



U.S. LEGAL SUPPORT
The Power of Commitment™



1   A.   You need to be more particular than these.

2   Q.   Did you ever tell anyone they could contact Step

3       Forward to try to get money to prevent a tax

4       foreclosure?

5   A.   In what -- the answer --

6           MR. COUVREUR:  Wait.  So --

7   BY MR. SMITH:

8   Q.   Did you ever talk to Mrs. Boyd about her house?

9   A.   Mrs. Boyd, after camping out in my office for about an

10      hour and a half, I came out of a meeting. I felt

11      compelled to have a discussion. My typical discussion

12      on one of these matters is until the title is cleared

13      I'm not comfortable having a conversation, and I do my

14      best to stick to that until the title is cleared.

15   Q.   What do you mean, cleared, when the NRI gets a deed?

16   A.   Till we get the -- till we get it through the title.

17      There may -- there could be a procedural error and I

18      don't like commenting about this, but Mrs. Boyd did,

19      you know, wait in the main office. I came out of a

20      meeting. She had been there a long time. I did have

21      a conversation with her.

22   Q.   And what was the substance of the conversation?

23   A.   The substance of the conversation at that point was

24      I'm uncomfortable having a conversation until we have

25      the title cleared.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 73

1    Q.    So did you ever talk to her on another occasion?

2    A.    I believe she was here one other time.

3    Q.    And what -- do you recall what that conversation was

4          about?

5    A.    At that point I did encourage her to get an attorney.

6    Q.    All right.

7    A.    Can I make -- you asked about Step Forward. I've

8          never referred Mrs. Boyd to Step Forward. You

9          asked -- I have in the course of my couple years, to

10         people who are having tax situations, referred people

11         to Step Forward. I usually -- we do not refer people

12         to Step Forward who have already lost their homes.

13   Q.    Well, haven't any of these people ever come to the

14         City and ask for some kind of assistance before they

15         lost their homes to foreclosure?

16   A.    Not to my knowledge. What --

17         MR. COUVREUR:   Well, but just clarify.   To

18         you, I mean, you said to the City, right, that was

19         your question?

20                THE WITNESS:   Right.

21                MR. COUVREUR:   All right.

22   BY MR. SMITH:

23   Q.    Well, do you or anyone on your staff (inaudible)?

24   A.    Repeat the question, I'm sorry?

25   Q.    Let me put it this other way.   I've had people, my


U.S. LEGAL SUPPORT
The Power of Commitment™

1    client, say that they talked to you at length prior to

2    tax foreclosure.

3    A.   To me?

4    Q.   Yeah, and --

5    A.   Absolutely not.

6    Q.   Okay.  If someone -- you've testified earlier that you

7         don't have anything to do with the treasurer, is that

8         true, the treasurer's office, or did I misunderstand

9         that, or is it the assessor?

10   A.   I don't --

11   Q.   You supervise the treasurer's office?

12   A.   I supe -- no, the super -- no.  I would need to review

13        exactly what was said.  The clerk and the treasurer

14        are elected.  They have -- they report -- they

15        actually have a very high degree of autonomy.  The

16        treasurer's office does not report to the city

17        administrator.

18   Q.   Just a few more questions about -- well, a few more

19        questions.  Mitchell Simon, does he have any

20        accounting expertise?

21   A.   Mitchell Simon I believe is a C.P.A.

22   Q.   Does he still practice or is he retired, or if you

23        know?

24   A.   I don't know.

25   Q.   So the best -- who makes the decision on what rehab



US LEGAL SUPPORT
The Power of Commitment™

1      has to be done to a house at the NRI?

2                 MR. COUVREUR:  I guess I'm going to

3      continue to object.  I don't know what this has to do

4      with this landlord/tenant action.

5      BY MR. SMITH:

6      Q.   Who runs NRI on a day-to-day basis, you?

7      A.   No.

8      Q.   Who?

9      A.   Habit -- what's the question?

10     Q.   Who runs the NRI on a day-to-day basis?

11     A.   There is a manager who runs NRI.

12     Q.   Who's that?

13     A.   The three people we've discussed.

14     Q.   Which is?

15     A.   Fred Zorn, Mitchell Simon and Etole Yvette (phonetic).

16     Q.   What about Maria Calhoun, is her name?

17     A.   What about her?

18     Q.   Does she work for them?

19     A.   Does she work for them, no.

20     Q.   She works for the City?

21     A.   She works for the City.

22     Q.   But she has done stuff for the NRI, right?

23     A.   In her capacity as a City employee her time has been

24     reimbursed by NRI.

25     Q.   How much?



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 76

1  A.   I don't know how much.

2  Q.   Does she do it during business hours?

3  A.   Yes, she does do it during business hours.

4  Q.   So why would she get reimbursed for doing --

5  A.   No, no.

6  Q.   -- two jobs?

7  A.   The City --

8  Q.   I'm not under --

9  A.   The City is reimbursed for her time, not Maria.

10 Q.   Oh, okay.  So how much overtime does she spend a week
         on the NRI stuff?

11      

12 A.   Overtime?  Who said she had overtime?

13 Q.   Or stuff, or any time?

14 A.   Well, I would have -- we do a monthly invoice
         estimated on her time.

15

16 Q.   Do you review that?

17 A.   Yes, I do.

18 Q.   Is there anyone else whose time gets reimbursed?

19 A.   Jerry Witkowski.

20 Q.   But he doesn't work full time for the City, does he?

21 A.   Does -- you're asking me he being who.

22 Q.   Well, if he doesn't work for the City how does the
         City get reimbursed for his time?

23

24 A.   Who said he doesn't work for us?

25 Q.   You just said that some of the people get reimburse --


USLEGAL SUPPORT
The Power of Commitment™



USLEGAL
SUPPORT
The Power of Commitment™

1       that the City gets reimbursed?

2  A.   The City gets reimbursed.  Jerry --

3  Q.   For Maria Calhoun's time?

4  A.   For Maria Calhoun's and the City also gets reimbursed

5       for Jerry Witkowski's time.

6  Q.   Does he work for the City?

7  A.   Jerry Witkowski is retired and he works as a

8       non-career employee.

9  Q.   And you can't explain why you got 2,500 from the NRI?

10 A.   I'd like to -- if -- I'd like to see the document.  I

11      mean, you're making a statement I don't know to be

12      true.

13 Q.   Like maybe it's in here.  Who's Josette Houston

14      (phonetic)?

15 A.   Who?

16 Q.   Do you know who Josette Houston is?

17 A.   No, I do not.

18 Q.   Do you know who Brandon Kleckly (phonetic) is?

19 A.   No.

20 Q.   Why does City of Southfield get money from the NRI?

21 A.   Reimbursement for time.

22 Q.   Construction cost, do you used City employees to do

23      construction work?

24 A.   No, we do not.

25 Q.   Huh?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



1    A.    No, we do not.

2    Q.    So why -- there's entries in there?

3    A.    I would have to ask Mitchell Simon.  It looks like we

4          got a split between multiple addresses for different

5          time and it could --

6                MR. COUVREUR:    It could be water bills, it

7          could be taxes.

8    A.    Taxes.

9    BY MR. SMITH:

10   Q.    You don't know?

11   A.    No, I do not know.

12   Q.    What's a transaction to reclassify, do you have any

13         idea what that means?

14   A.    I -- no, I do not.

15   Q.    Why is Mitchell Simon getting money from the NRI?

16   A.    Mitchell provides a certain amount of hours gratis and

17         then he is compensated for a certain amount of time

18         over X number of hours as approved by the manager.

19   Q.    Is there a contract on that?

20   A.    I don't believe there's a contract but there is a

21         resolution.

22   Q.    Okay.  Does Linda Stanton -- who's she?

23   A.    A clerk.

24   Q.    Linda Stanton?

25   A.    A clerk, secretary.

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 79



1  Q.  For the City?

2  A.  Yes.

3  Q.  Your secretary?

4  A.  No, she's not my secretary.  She works for the City.

5  Q.  She works for the City?

6  A.  Yes, sir.

7  Q.  So you have no information that Mrs. Boyd's house is

8      blighted, right?

9  A.  I've not been in it.  I don't know.

10 Q.  And you're saying there's no written agreement on how

11     any proceeds that would be obtained by the sale of

12     Mrs. Boyd's house, how they would get allocated.  It's

13     everything's on -- you said it was fluid before,

14     right?

15 A.  The process is fluid.

16 Q.  Like the money would -- when do you have to -- who

17     determines the deadline of when the Nonprofit has to

18     pay the City back for advancing the funds to the

19     County?

20 A.  Repeat the question?

21 Q.  Who determines how long the Nonprofit has to pay back

22     the City?

23 A.  The Nonprofit doesn't have anything to pay back to the

24     City.

25         MR. COUVREUR:  What are you -- could you



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 80

```
 1          ask him a question?

 2   BY MR. SMITH:

 3   Q.     When you -- the City of Southfield exercises their

 4          right of first refusal they have to pay the County the

 5          past-due taxes, correct?

 6   A.     The City does.

 7   Q.     Right.

 8   A.     And the City advanced those funds -- or the Non -- the

 9          Nonprofit advanced those funds on behalf of NRI.

10   Q.     Right.  And then how long does -- oh, okay.

11                  So then how long does -- well, what I'm

12          trying to say, does the Nonprofit pay the City before

13          they exercise their right of first refusal or after?

14   A.     It's done concurrently.

15   Q.     Concurrently?

16   A.     Yeah.

17   Q.     Okay.  And then when you -- the NRI gets title, and

18          specifically if you sold this Woodgate Drive house,

19          you would -- the NRI would get the money and you --

20          the way I understand what you're telling me is there's

21          no specific understanding, written formula that

22          controls how this money gets transferred from the NRI

23          to the Nonprofit?

24   A.     That part I would describe as fluid, we're still

25          working our way through.  We've not closed out
```

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 81

1    portfolio 2016. Everything is done on an entire
2    portfolio. In 2016 we had the right -- the City
3    exercised its right of first refusal.
4              MR. COUVREUR: All right. Just answer his
5    question, that's all.
6              THE WITNESS: Okay.
7              MR. COUVREUR: Just -- and I think you did.
8    BY MR. SMITH:
9    Q.   All right. So do you -- does the NRI do profit and
10   loss statements?
11   A.   Yes, we do.
12   Q.   Have you finished the one for 2016?
13   A.   No.
14   Q.   Who's the accountant, Mitchell Simon's firm?
15   A.   Yes, sir.
16             MR. COUVREUR: Well, wait --
17   BY MR. SMITH:
18   Q.   As a City official do you see any con --
19             MR. COUVREUR: Well, wait. You say a firm,
20   I mean --
21   BY MR. SMITH:
22   Q.   Is he an individual accountant?
23             MR. COUVREUR: See, that's -- that's what
24   I'm -- I'm a little -- these things are a little bit
25   misleading here, so I need you to clarify your



US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 82



1    question. You had a question is there a profit and

2    loss statement, has it been done. Fred either said I

3    don't know or he said it's not been done, right? Is

4    that true? Am I right with that? And then you ask a

5    question about Mitchell Simon --

6         MR. SMITH: Wait, are you talking to me or

7    your client?

8         MR. COUVREUR: Well, I'm trying to figure

9    this out, and again, you're -- here's my concern. You

10   said Mitchell Simon's firm, or am I incorrect? Didn't

11   you say that? How about if you just rephrase --

12        MR. SMITH: Well, yeah, I --

13        MR. COUVREUR: -- that question?

14        MR. SMITH: -- said that.

15        If he doesn't have a firm, I'm just asking

16   who does the statements. I mean, I'm looking for

17   information.

18        MR. COUVREUR: I know. You're on a fishing

19   expedition and I still don't --

20        MR. SMITH: I'm almost --

21        MR. COUVREUR: -- know what it has to do --

22        MR. SMITH: Even if I am, the boat's coming

23   in, we're almost done.

24        MR. COUVREUR: Well, thank God for that.

25   A.   So the question?

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 83

1     BY MR. SMITH:

2     Q.     The question is -- okay.  Mitchell Simon is a C.P.A.

3            who's preparing profit and loss statements?

4     A.     He is preparing statements, P&L, but we also have

5            Plante Moran, who is preparing our -- the final

6            statements.

7     Q.     The NRI is a for-profit company, right?

8     A.     No.

9     Q.     It isn't?

10    A.     The NRI is --

11    Q.     Is it a 501(c)?

12    A.     It is a limited-liability entity under the

13           jurisdiction of the Southfield Nonprofit, and I'll let

14           my attorney describe that.

15    Q.     Well, how does the -- is it -- is it going to file a

16           tax return?

17    A.     We will be filing a tax return.

18    Q.     Is it going to be a separate one or part of the

19           Nonprofit?

20    A.     I'll let people way smarter than me figure that out.

21                  MR. COUVREUR:  No, no, it's part of the

22           Nonprofit.

23                  THE WITNESS:  The Nonprofit, okay.

24                  MR. COUVREUR:  It's clearly -- that's part

25           of it.


US LEGAL SUPPORT
The Power of Commitment™

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018



THE WITNESS: Okay.

1   BY MR. SMITH:

2   Q.   Are you adopting your counsel's answer?

3              MR. COUVREUR: Well, I'm just telling you

4   the truth, you know, it's part of that, so --

5   BY MR. SMITH:

6   Q.   So you don't really know how the accounting's going to

7   be done?

8   A.   I haven't seen the -- I haven't see the tax return for

9   the 2017 year, so I'm --

10  Q.   Wait a minute. You're --

11  A.   -- I'm under the --

12  Q.   -- telling me -- you're saying there's --

13  A.   I'm under --

14  Q.   -- not going to be a separate tax return?

15  A.   Pardon?

16  Q.   If I understood what your counsel said is that there's

17  not going to be a separate tax return for the NRI. Is

18  that your understanding?

19  A.   Let me tell -- here's my understanding. There will be

20  a tax return for NRI, L.L.C.

21             MR. COUVREUR: Okay. But --

22  A.   There will also be another -- others that fold into --

23             MR. COUVREUR: Yeah, Fred. I think maybe

24  you better -- all I always -- if you know, you know.

25

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 85



1    If you don't --

2    A.    Then I --

3              MR. COUVREUR:    -- know, you don't know.

4    A.    I don't know.   I don't know.   I'll wait and --

5    BY MR. SMITH:

6    Q.    Have you ever seen a tax return from the Southfield

7    Neighborhood Revitalization Initiative?

8    A.    We haven't completed our first year.

9    Q.    So you haven't done 2016.   You haven't done 2017

10   obviously?

11   A.    That's correct.

12   Q.    Okay.   And how do you know -- you mentioned previously

13   that there's going to be a loss.   If you haven't seen

14   a profit and loss or a tax return how do you know

15   that?

16   A.    How do I know that?   Because you sit through and

17   approve -- when Habitat For Humanity approves what

18   we're spending per home and what it's going to cost

19   and you see yourself losing 20, 40,000, you can

20   quickly -- you can do a crude math and you know you're

21   probably on a course to lose about a quarter of a

22   million dollars in the 2016 portfolio.

23   Q.    Do you have any criteria for who purchases the houses?

24   A.    What do you mean, criteria for who purchases a house?

25   Q.    Well, do you have like a policy -- for instance, you

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 86

1  said you -- you apparently don't like renters.

2  A.  No, that's a discriminatory statement. That's just --

3  that's not even what this --

4  Q.  No, I'm asking you --

5  A.  -- we're about.

6  Q.  -- do you --

7  A.  You're asking me if we discriminate. No, we don't

8  discriminate. That's --

9  Q.  I didn't --

10 A.  That's insulting.

11 Q.  You're taking my words out of --

12 A.  No, you used the word discriminate.

13 Q.  What I'm -- let me rephrase this. What I'm saying is

14 you stated that the City of Southfield as the city

15 administrator doesn't like when there's too many

16 renters in an area, so does the NRI have a policy that

17 you don't sell to rent -- people who are going to rent

18 the houses, investment people?

19 A.  No, we don't have a policy.

20      MR. COUVREUR:  Okay.  If I may, and I don't

21 know how to handle this, but to your knowledge you

22 don't, but I -- could I just refresh his memory a

23 little bit? All homes -- and you know what, he

24 doesn't know this because he doesn't deal with it,

25 but --



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 87

1    MR. SMITH:   But I really don't want you to

2   testify.

3        MR. COUVREUR:   Well, I don't want him to

4   say something --

5        MR. SMITH:   Well, if you want --

6        THE WITNESS:   Then I --

7        MR. SMITH:   -- to advise him --

8        THE WITNESS:   Then I don't know.

9        MR. SMITH:   -- off the record you can.

10        MR. COUVREUR:   If I could, there -- if I

11   could, I just want to remind him of a fact.

12        MR. SMITH:   I'm about done here.

13        MR. COUVREUR:   No, but -- no, Fred.  While

14   we are almost done, I think he said that, but we can

15   go off the record.

16        (Discussion off the record at 1:22 p.m.)

17        (Back on the record at 1:22 p.m.)

18   BY MR. SMITH:

19   Q.   Do you get -- I understand you haven't done tax

20   returns.  Do you --

21        MR. COUVREUR:   But could you go back on the

22   record and let him fix his answer to that, since we're

23   back on the record, so he can -- on the record it says

24   there's no policy for --

25        THE WITNESS:   Right.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 88

1

2          MR. COUVREUR:  Could you just re-ask him

3    that question?

4          MR. SMITH:  Then you ask him.

5    BY MR. SMITH:

6    Q.    Okay.  Your counsel -- do you want to clarify or add

7    anything to your prior answer?

8    A.    For the record, NRI does have a policy that the

9    property must be owner occupied for the first five

10   years.  I've recently been informed of that by my

11   attorney.

12   Q.    Where is that written, in the minutes somewhere?

13   A.    I would need to look at the minutes.

14   Q.    Your counsel told you that but you don't know where

15   it's written down?  I'm just asking.  Your counsel

16   just told you that that's their policy, which I --

17   there's nothing wrong with that if he's the attorney

18   for the NRI.

19          Well, you don't personally know where the

20   policy's written or where it comes from; is that --

21   A.    Define policy?

22   Q.    It's your policy.

23   A.    What does the word policy mean?

24   Q.    I mean, you're a city administrator, I would think --

25   do you see any conflict in interest in how all the



THE WITNESS:  For the --

FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1    same people are on a nonprofit, on the NRI, work for

2    the City?

3    A.   No, we're doing public good.  We're doing good.

4    Q.   Okay.  So here's my question, do you get monthly or

5    .    quarterly updates on what's happening economically

6         with the NRI?

7    A.   We get monthly financial reports, yes.

8    Q.   And you could produce those, right?

9    A.   Mitchell Simon could produce those things.

10   Q.   I'm sorry, I didn't hear you?

11   A.   Mitchell Simon can produce those.

12            MR. SMITH:  I don't have anything further.

13   Thanks.

14            MR. COUVREUR:  Okay.  So on your -- I

15   noticed this today.  It says deponent is instructed

16   with respect to these documents, so, you know, this

17   says all documents, intended exhibits at trial.  That

18   would -- we're not limited to that, I'm not agreeing

19   that these are the only documents we're going to

20   produce at trial, so I just want to be clear with

21   that, and maybe that was just in your form here.  I'm

22   going to -- if we end up --

23            MR. SMITH:  Well, you signed a -- your

24   attorney did a pre-trial statement with listed

25   exhibits.



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

1

2          MR. COUVREUR:  Right.  Okay.

3          MR. SMITH:  I assume at some point, if it

4   gets too close to trial, it would --

5          MR. COUVREUR:  Right.  I just saw your

6   language here and I didn't want to be tied into that,

7   in your subpoena here.  Your subpoena says all

8   exhibits at trial, so I'm not going to surprise you at

9   trial.

10         MR. SMITH:  Well, I mean, if you put it in

11  your pre-trial statement I'm --

12         MR. COUVREUR:  You're good?

13         MR. SMITH:  That's obviously fine.

14         MR. COUVREUR:  You're good with that.

15         MR. SMITH:  I'm not trying to trick you or

16  anything.

17         MR. COUVREUR:  Well, okay.  I just want to

18  be clear with that, so, okay.  All right.  So we're

19  done?

20         MR. SMITH:  We're done, unless you want to

21  ask him any?

22         MR. COUVREUR:  No.

23         MR. SMITH:  We'll go off the record.

24              (The deposition was concluded at 1:26 p.m.

25              Signature of the witness was not requested by

              counsel for the respective parties hereto.)



FREDERICK E. ZORN, JR., C.E.C.D.
February 6, 2018

Page 91

CERTIFICATE OF NOTARY

1
2   STATE OF MICHIGAN )
3                     ) SS
4   COUNTY OF OAKLAND )
5
6               I, ALAN STALBURG, certify that this
7   deposition was taken before me on the date
8   hereinbefore set forth; that the foregoing questions
9   and answers were recorded electronically and
10  transcribed by me; that this is a true, full and
11  correct transcript of my recording so taken; and that
12  I am not related to, nor of counsel to, either party
13  nor interested in the event of this cause.
14
15
16
17
18
19
20
21
22                          ALAN STALBURG, CER-9106
23                          Notary Public,
24                          Oakland County, Michigan
25  My Commission expires:  October 6, 2022




The Power of Commitment™